**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **J. DANIEL GODARD, JR.,** *et al.*, | ) | |
| | ) | **PUBLISH** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 06-0267-WS-C** |
| | ) | |
| **ALABAMA PILOT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 45) and Plaintiffs' Motion for Summary Judgment (doc. 54). Both Motions have been fully briefed and are ripe for disposition at this time.

**I.    Factual Background.**

This collective action under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), involves a singular question, to-wit: whether the nine similarly situated plaintiffs in this case are properly considered exempt from overtime compensation under the FLSA. More precisely, this lawsuit turns on the statutory provision that exempts "any employee employed as a seaman" from the ambit of the FLSA's overtime pay requirements. 29 U.S.C. § 213(b)(6).

The obvious starting point for the analysis is to determine what plaintiffs' job duties actually are and how they spend their working hours. On this point, the parties agree that the material facts are largely undisputed. The nine plaintiffs in this case are launch operators, currently or formerly employed by defendant, Alabama Pilot, Inc. (Barrett Aff., ¶ 3.)[1] These launch operators navigate and pilot Alabama Pilot's two small boats (called "launches" or "pilot boats") that ferry bar pilots to and from vessels entering or leaving the Port of Mobile, including

---

[1]    The named plaintiffs are J. Daniel Godard, Jr., Tommy Wescovich, Mark V. Collier, Sr., Lonnie Johnson, James D. McClure, William Block, Joseph F. Murphy, Sr., Winston L. Steiner, and Chadwick A. Smith.

the Theodore ship channel and the Port of Bayou LaBatre.[2]  Thus, the launch operators are responsible for captaining the boats that transport the bar pilots from a pilot station on Dauphin Island to inbound vessels at the entrance of Mobile ship channel, and that likewise transport bar pilots from outbound vessels at the mouth of the Mobile ship channel back to the pilot station. (Godard Dep., at 76; McClure Dep., at 100; Burns Dep., at Exh. 8.)[3]

Alabama Pilot's launch operators work long hours set by a collective bargaining agreement.  Until May 2006, the launch operators worked 24 consecutive hours on duty (in the form of two back-to-back 12-hour shifts), followed by 48 consecutive hours off duty.  (Godard Dep., at 55; Wittendorfer Dep., at 33.)  The result was that plaintiffs would work 72 hours one week, then 48 hours for each of the next two weeks, before the cycle would repeat itself. (Barrett Dep., at 30-31.)  As of May 2006, however, the arrangement changed, such that Alabama Pilot now schedules launch operators to work seven consecutive 12-hour "day" shifts, followed by seven consecutive 12-hour "night" shifts, followed by seven consecutive days off. (McClure Dep., at 20; Johnson Dep., at 20.)  Under this system, then, plaintiffs work 84 hours per week for two straight weeks, then 0 hours for the third week.  Both prior to and after the May 2006 scheduling change, Alabama Pilot has never paid plaintiffs overtime compensation under the FLSA for hours worked in excess of 40 in a workweek.[4]  In general, plaintiffs are paid a flat "daily rate" for each 12-hour shift, which rate has increased annually from $124.96 in 2003 to

---

[2]    This service is necessary to comport with a provision of Alabama law which requires that "[a]ll steam or sail vessels crossing the outer bar of Mobile Bay, except those exempt under this chapter, shall be conducted, controlled or navigated by a pilot licensed by or under authority of the laws of the State of Alabama."  Ala. Code § 33-4-54.

[3]    The very first duty listed in a job description for launch operators is the following: "Safely transport personnel to and from vessels."  (Burns Dep., at Exh. 8.)

[4]    That said, plaintiffs have received certain types of contractual premium pay, such as overtime of double pay for hours worked in excess of 24 consecutive hours prior to May 2006, and, if they work more than 13 hours consecutively, double time for hours worked in excess of 12 consecutive hours following May 2006.  (McClure Dep., at 27-28; Barrett Dep., at 30; Godard Dep., at 96.)  This contractual overtime is analytically distinct from the question of whether plaintiffs are entitled to FLSA overtime at one and one-half times their regular rate for all hours worked in excess of 40 in a workweek.  Except where specifically noted otherwise, all references to overtime herein refer to FLSA overtime, rather than contractual overtime.

approximately $149.00 in 2006. (Wittendorfer Dep., at 31-32.)[5]

The critical factual questions in this action relate to the job duties that launch operators perform, and the proportion of their working hours that they devote to particular categories of duties. Neither the plaintiff launch operators nor the defendant employer have maintained minute-by-minute reports, comprehensive logs, or other detailed time records that specifically track how the launch operators spend their time (Godard Dep., at 218; McClure Dep., at 56; Wescovich Dep., at 49; Johnson Dep., at 39; Collier Dep., at 59-60); therefore, it is necessary to piece together a summary of their activities from the record, which includes excerpts from each of the nine named plaintiffs' depositions.[6]

Launch operators report for duty at a land-based structure consisting of a boat dock and pilot station on Dauphin Island. (Wittendorfer Dep., at 49; Godard Dep., at 80-81.) The pilot station is a freestanding building containing a "radio room" from which launch operators monitor radio and telephone communications relating to the scheduling and transport of bar pilots. (Id.)[7] There is broad consensus among the parties that transporting bar pilots by boat to and from vessels requiring bar pilot services is the launch operators' foremost job duty. In that regard, plaintiff Dan Godard agreed that the launch operators' primary function was "to put them on the ship or get them off the ship." (Godard Dep., at 76.) Similarly, plaintiff Doug McClure testified that the launch operators' "main job" is to drive the pilot boat and to "[s]ee that the pilots are safely out there and safely back." (McClure Dep., at 32, 41.) Other plaintiffs testified

---

[5]     To convert that straight-time daily rate into an hourly rate for purposes of any overtime calculations that might be needed, one would simply divide the daily rate by 12 hours. Thus, the launch operators' regular hourly rate has ranged from $10.41 in 2003 to $12.42 in 2006. (Wittendorfer Dep., at 31-33.)

[6]     There appears to be little debate among the parties as to the actual job duties of the launch operators, although they disagree vehemently as to the legal implications of those duties. Under the circumstances, the issues joined in these dueling Rule 56 motions might have been more efficiently presented had the parties submitted stipulated facts, rather than forcing the Court to undertake the laborious task of sifting through voluminous deposition transcripts in order to understand plaintiffs' duties.

[7]     In its present configuration, the pilot station consists of the radio room, a kitchen, a bathroom, and an area for resting. (Johnson Dep., at 23.)

-3-

similarly.  (Steiner Dep., at 26; Wescovich Dep., at 27.)

While operating Alabama Pilot's two launches (the *Alabama* and the *Mobile Pilot*) may be plaintiffs' primary duty, it is undisputed that they neither spend 100% of their working hours captaining a pilot boat nor spend their entire shift on the boat.  (Godard Dep., at 78; McClure Dep., at 22-23.)  Indeed, Alabama Pilot's records reflect that, between March 2004 and August 2006, the pilot boats operated for 7.09 hours per 24-hour period, or 29.5% of the time.  (Barrett Dep., at 39-40.)[8]  That fact, which neither side challenges, raises the question of what the launch operators are doing for the nearly 17 hours of each 24-hour shift, or the nearly 8.5 hours of each 12-hour shift, in which they are not actually operating the launches.[9]

Pilot boats do not operate on a set, routine schedule, but may be called into service anytime, day or night, and often on short notice, depending on the need for bar pilots.  When the launches are not operating, Alabama Pilot's launch operators do not remain aboard those boats waiting to spring into action; instead, they spend most of their time inside the pilot station, approximately 30 feet from the docks.  (Wittendorfer Dep., at 53; Barrett Dep., at 57.)  There is

---

[8]     The 29.5% figure is drawn from Alabama Pilot logbooks which reflect the total amount of time in each 24-hour period in which each launch's engines are running.  (Wittendorfer Dep., at 78.)  In those logs, launch operators record the exact period of time in a shift in which the engines are running, as measured by a counter onboard.  (*Id.*)  In general, the period of time in which the engines run should closely approximate the total period of time in which the boats are operated, although the time spent operating a vessel may be somewhat lower than the recorded engine hours because the engines may need to be warmed up, or operated for certain maintenance tasks.  (*Id.* at 85-86; Cook Dep., at 2.)  Records reveal significant variance in the month-to-month daily averages during the March 2004 - August 2006 time period, with launch operations ranging from a low-end figure of 4.86 hours per 24-hour shift in August 2005 to a high-end figure of 12.18 hours per 24-hour shift in October 2005. (Wittendorfer Dep., at Exh. 3.)  Notwithstanding these outliers, the daily average operation of the boats' engines hovered between 5.9 and 8.3 hours for 24 of the 30 months in which data is available.

[9]     All parties assume, without explanation, that the 7.09 hours reflects the total time that each launch operator was at sea per 24 hours.  But two launch operators are on duty at a time; therefore, the 7.09 hours figure could only be accurate if both on-duty launch operators are always aboard each pilot boat whenever it sails.  The parties have identified no record evidence that such is the case.  Nonetheless, the Court will assume it to be true for purposes of this Order; otherwise, the parties' agreed figure of 7.09 hours would overstate the actual time at sea for each launch operator in a given 24-hour period.

no dispute that the plaintiffs spend a significant percentage of their on-duty hours on standby, sitting in the radio room, monitoring the radio and telephone, and waiting for calls requesting that a bar pilot be either picked up or delivered to another vessel. (McClure Dep., at 35, 42-43; Wescovich Dep., at 32; Murphy Dep., at 30.) Although other estimates may exist, plaintiff Tommy Wescovich testified that the launch operators spend "[o]ver half" of their working time waiting to be called to pick up or drop off a bar pilot. (Wescovich Dep., at 32.)[10] At any given moment, two launch operators are on duty. (McClure Dep., at 40.) That way, if one launch operator is moving cars or otherwise away from the pilot station, the other can remain at the station to monitor radio traffic. (*Id.*) When the launch operators are not piloting a boat, one can listen for the radio and telephone while the other one rests in crew quarters or performs odd jobs around the pilot station and its environs. (Collier Dep., at 48.)[11]

Plaintiffs characterize the radio/telephone duties as dispatching, and suggest that they spend an inordinate share of their time engaging in such dispatching functions. In that regard, launch operators contend that they are on the telephone "almost constantly over a 24 hour period" fielding calls from line handlers wanting to know when ships will arrive in port, from the Coast Guard inquiring about particular ship runs, from pilots (both on-duty and off-duty) inquiring about scheduling matters, and the like, all of which prompts plaintiffs to contend that these were mere dispatching duties. (Godard Dep., at 175.) But Alabama Pilot also employs two full-time dispatchers, who are not parties in this action. (*Id.* at 176.) Those dispatchers are responsible for calling the launch operators to furnish them with a schedule of ships, and to notify the launch operators of any changes to that schedule. (Wescovich Dep., at 44.)

When not operating the launch boats or monitoring radio and telephone traffic, the launch operators fill their working hours with a dizzying array of odd jobs and general labor tasks.

---

[10]     This account is echoed by Kirk Barrett, an Alabama Pilot representative, who testified that when the launch operators are not operating a pilot boat, "[t]he biggest job is to maintain our radio watch," such that a launch operator is always standing by via radio. (Barrett Dep., at 40.)

[11]     Apparently, Alabama Pilot modified the working rules for launch operators in June 2006, after the inception of this litigation, to prohibit launch operators from sleeping while on duty. (Burns Dep., at Exh. 8.)

According to plaintiffs, launch operators' duties are "many and varied," and include such functions as painting the house, watering the grass, fueling and moving cars, planting and fertilizing trees and bushes, repairing fences and cabinetry, cleaning windows and toilets, and the like, such that their duties are "[j]ust general labor and whatever had to be done."  (Godard Dep., at 76.)  In the words of plaintiff McClure, the launch operators spend more time doing "general handyman stuff" like driving cars, working around the yard, moving dirt and rocks, and cleaning up storm debris than they do operating the pilot boats.  (McClure Dep., at 30.)  Launch operators "did a multitude of stuff that we don't ordinarily do when you are at sea."  (Steiner Dep., at 24.)  For example, launch operators mop and sweep the pilot station, take out the trash, clean the refrigerator, clean the stove, and cook meals and wash dishes for themselves.  (Wescovich Dep., at 34-35.)  They "do maintenance around the yard or on the boats."  (Collier Dep., at 41.)  Overall, plaintiffs do "[p]retty much a little bit of everything" at the pilot station while waiting to be called to captain the boats.  (Smith Dep., at 32.)[12]  At least one plaintiff testified that launch operators perform such projects as "[m]aintenance on the house, maintenance on the grounds ... continuously on a daily basis."  (Godard Dep., at 139.)

On occasion launch operators perform landscaping tasks such as planting trees, spreading grass seed, and watering grass.  (Murphy Dep., at 34-37.)  Several times launch operators painted the old pilot station before Hurricane Ivan destroyed it in 2004.  (Murphy Dep., at 35.)  On one occasion, the launch operators planted shrubs around the pilot station grounds.  (Barrett Dep., at 53.)  At other times, the launch operators have helped the port engineer[13] dig ditches, repair

---

[12]     For instance, the record reflects that Alabama Pilot assigns weekly cleaning duties to launch operators for the pilot station, including such functions as cleaning base boards, door trim, doors and window casings; dusting and cleaning window and door blinds; applying glass cleaner to windows and door glass, both inside and out; cleaning kitchen, locker room, desk and bath cabinets; cleaning all shelves and drawers of the refrigerator and freezer; cleaning the stove top and oven; cleaning the shower stall; sweeping the porch, concrete slab and fuel pump areas; sweeping and mopping all floors, shaking and sweeping all rugs, cleaning toilet and bath sink, wiping all countertops, and washing and storing all dishes; and removing all garbage. (Wittendorfer Dep., at Exh. 6.)

[13]     The port engineer, Harry Bush, is not a party to this action.  Bush, an employee of Alabama Pilot, testified that his duties are to take care of the boats by making sure they are clean, keeping the engines running, and performing maintenance work on them, as well as

water lines, and perform other maintenance tasks around the grounds of the pilot station.  (Block Dep., at 41.)[14]  All of these responsibilities were a reflection of defendant's admonition to launch operators that "they didn't want us sitting there resting and watching television when we were in between runs, that we were to find something to do."  (Godard Dep., at 139.)[15]

Perhaps chief among these "odd jobs" is the category of work that plaintiffs describe as "moving vehicles."  Because the pilot station is on Dauphin Island, bar pilots often require ground transportation to or from Mobile, Bayou LaBatre or Theodore before being carried out to sea or after being brought back to shore on the pilot boats.  (McClure Dep., at 41-42; Steiner Dep., at 27-28; Johnson Dep., at 27; Wescovich Dep., at 38-39.)  The launch operators typically provide that transportation by driving the pilots, or dropping off/picking up company vehicles for the pilots, at those different locations as needed.  (McClure Dep., at 100-01; Collier Dep., at 49-

---

performing maintenance responsibilities for company automobiles.  (Bush Dep., at 14-16.)  Bush is not a crew member on the pilot boats but merely performs maintenance duties when the boats are docked at the Dauphin Island facility.

[14]     Such building and grounds responsibilities were exacerbated in the wake of Hurricanes Ivan and Katrina, which inflicted significant damage to the Dauphin Island area in September 2004 and August 2005, respectively.  By one estimate, plaintiffs devoted ongoing attention to cleaning up the remnants of the pilot station, which had been smashed by Hurricane Ivan, for a year and half after the storm.  (Godard Dep., at 118-19.)  Yet McClure testified that plaintiffs spent only a week or two cleaning up after the hurricane.  (McClure Dep., at 34; Wescovich Dep., at 38.)  In support of its Rule 56 Motion, Alabama Pilot urges the Court to reject the Godard estimate because "[n]o reasonable jury could believe Godard." (Defendant's Brief, at 22-23.)  Of course, on summary judgment this Court is not permitted to make credibility determinations of the kind advocated by defendant, but must instead consider the evidence in the light most favorable to the nonmovant.  Whatever the time frame may have been, it is undisputed that plaintiffs spent work time moving storm debris and cleaning the grounds after Hurricanes Ivan and Katrina, two cataclysmic events with potentially extraordinary short-term impacts on plaintiffs' job duties.  (Collier Dep., at 53-54.)  The question of whether plaintiffs spent a week and a half or a year and a half performing hurricane cleanup duties is a fact question to be resolved at trial.

[15]     On this point, however, plaintiffs' testimony stands in contrast to that of Alabama Pilot's representative, who testified that, in the course of monitoring the radios and telephones, the launch operators spent most of their working time watching television, as Alabama Pilot "contracted out any major work that needed to be done.  There just wasn't that much to do down there."  (Barrett Dep., at 53.)  This inconsistency cannot be resolved on summary judgment, but is instead taken in the light most favorable to the nonmovant on each Rule 56 motion.

-7-

50.)  Thus, as plaintiff Steiner put it, launch operators routinely "hauled pilots from here to yonder" on land.  (Steiner Dep., at 24.)  These "ground transportation duties" are reasonably estimated to consume approximately 2.5 to 2.7 hours per week of each launch operator's time, or somewhere between 3% and 5.6% of each plaintiff's weekly work hours (which could vary from 48 to 84 during the period of interest).  (Barrett Aff., ¶¶ 4-7.)[16]

Launch operators check the boats' oil, fuel, and water every shift.  (Godard Dep., at 126-27; Wescovich Dep., at 28; Collier Dep., at 41.)  They clean the pilot boats during every shift.  (Collier Dep., at 42.)  More generally, launch operators are assigned daily maintenance tasks for the launches, such as inspecting the vessel for damage or malfunction, which is "something that any seaman would do going on watch."  (Wittendorfer Dep., at 53-54.)  Daily inspections of the vessels should take approximately 10 to 15 minutes at the outset of each shift.  (*Id.* at 54.)  Launch operators are also required to wash the launch boats approximately three times per week, which requires approximately an hour and a half on each occasion.  (*Id.* at 55.)  Launch operators paint a boat once every six months.  (Wescovich Dep., at 28, 30; Collier Dep., at 43-44.)  They complete logbook entries for the boats.  (Wescovich Dep., at 27-28; Johnson Dep., at 22.)  Alabama Pilot employs a separate port engineer specifically for the purpose of performing maintenance work on the pilot boats; however, launch operators assist him with those maintenance activities from time to time.  (Wescovich Dep., at 29-30.)

## II.  Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at

---

[16]     Alabama Pilot maintains records of every car trip made by a launch operator because employees receive additional compensation for those trips.  Based on those records, and reasonable estimates of the time required for each car trip (90 minutes from Dauphin Island to Mobile and back, 60 minutes to and from Theodore, and 45 minutes to and from Bayou LaBatre), Alabama Pilot found that plaintiffs spent roughly 2.5 hours per week on driving assignments, with such assignments never exceeding 20% of a launch operator's working time during the April 2003 to December 2005 period.  (Barrett Aff., ¶¶ 4-8.)  Plaintiff Godard, among others, concurred with the reasonableness of those per-trip estimates.  (Godard Dep., at 184.)

trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment.  *See Gerling Global Reinsurance Corp. of America v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001).  Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits").  However, it is also true that cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts.  *Oakley*, 744 F.2d at 1555-56.

## III.  Analysis.

### A.  Contours of the FLSA "Seamen" Exemption.

The FLSA generally requires that an employer employing a non-exempt employee for a workweek exceeding 40 hours must provide compensation for all hours in excess of 40 at a rate of not less than one and one-half times the employee's regular rate.  *See* 29 U.S.C. § 207(a)(1).  Here, it is undisputed that plaintiffs work more (and often far more) than 40 hours for each

workweek in which they are on duty, and that Alabama Pilot has never paid them overtime compensation for hours worked in excess of 40.  As such, defendant is in violation of the FLSA unless plaintiffs are in some way exempt from these overtime provisions.  This case turns on a specific statutory exemption, which excludes from the ambit of the overtime requirement "any employee employed as a seaman."  29 U.S.C. § 213(b)(6).[17]  If the launch operators are seamen, then they are exempt from the FLSA; otherwise, they are covered by the FLSA and are owed a sizeable award of unpaid overtime compensation.

The FLSA does not define the term "seaman"; however, the Department of Labor ("DOL") has promulgated regulations explaining that an employee will be regarded as a seaman for FLSA purposes "if he performs, as master or subject to the authority, direction, and control of the master aboard a vessel, *service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character*."  29 C.F.R. § 783.31 (emphasis added).  The regulations further state that an employee's eligibility for the seaman exemption "depends upon the character of the work he actually performs and not on what it is called or the place where it is performed."  29 C.F.R. § 783.33; *see also Bailey v. Pilots' Ass'n for Bay and River Delaware*, 406 F. Supp. 1302, 1307 (E.D. Pa. 1976) ("Whether one is a seaman depends upon the work actually performed, not the job title.").  A concessionaire, dredging employee, or stevedore is not FLSA-exempt as a seaman simply because he happens to perform such duties aboard a vessel, inasmuch as such services generally are not rendered primarily as an aid to operation of the vessel as a means of transportation.  *See* 29 C.F.R. §§ 783.33 - .34.  By contrast, a vessel's crew members (*e.g.*, sailors, engineers, radio operators, surgeons, cooks, etc.) are seamen if, as in the usual case, their

---

[17]    The FLSA's legislative history suggests that Congress excluded seamen from overtime protection not because of any substantive policy judgment about the propriety of paying seamen overtime, but instead for procedural reasons to avoid jurisdictional conflict with other remedial provisions that already regulated the industry.  *See generally McLaughlin v. Boston Harbor Cruise Lines*, 419 F.3d 47, 54-57 (1st Cir. 2005) (Lopez, J., concurring); *but see Harkins v. Riverboat Services, Inc.*, 385 F.3d 1099, 1102 (7th Cir. 2004) (opining that FLSA's seaman exemption "recognizes that, at sea, with a normal life impossible, working more than 40 hours a week is an appropriate work norm, as distinct from the situation in most ordinary employments").

service is rendered primarily as an aid in the operation of the vessel as a means of transportation. *See* 29 C.F.R. § 783.32; *Martin v. Bedell*, 955 F.2d 1029, 1036 (5th Cir. 1992) ("A cook is *usually* a seaman because he usually cooks *for* seamen.").  Again, then, the touchstone of the seaman inquiry is whether "one's services are rendered primarily as an aid in the operation of the vessel as a means of transportation, as for example services performed substantially as an aid to the vessel in navigation."  29 C.F.R. § 783.33.

A seaman is not automatically reclassified as a nonseaman if he performs any duties that do not primarily aid in the operation of his vessel as a means of transportation; rather, the test is one of substantiality.  *See* 29 C.F.R. § 783.32 ("an employee employed as a seaman does not lose his status as such simply because, as an incident to such employment, he performs some work not connected with operation of the vessel as a means of transportation ... if the amount of such work is not substantial").  Indeed, "[w]hen a worker performs both seaman's work and nonseaman's work, he is a seaman unless his nonseaman's work is substantial in amount." *Martin*, 955 F.2d at 1035-36.  To guide employers, courts and practitioners as to the specific parameters of this substantiality threshold, the DOL has long interpreted the FLSA's seaman exemption as being negated by substantial nonseaman's work that "occupies more than 20 percent of the time worked by the employee during the workweek."  29 C.F.R. § 783.37.

DOL interpretive bulletins and regulations have generally been afforded "great weight" by reviewing courts in applying the FLSA's seaman exemption.  *Martin*, 955 F.2d at 1035; *see also Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518, 521 (5th Cir. 1989) ("findings of the Department of Labor are entitled to great weight by the courts" and the DOL's consistent interpretation of the seaman exemption over the life of the FLSA commands "great respect").  Thus, the determination of whether a particular worker is eligible for the seaman exemption under the FLSA "calls for an examination of the nature of the work actually performed by the employees and of the comparative amount of seamen versus nonseamen duties."  *Petroleum Treaters*, 876 F.2d at 522.  This is necessarily a fact-sensitive inquiry.  As one court of appeals explained in interpreting the seaman exemption, "[t]he line of demarcation between seamen and non-seamen is not distinctly drawn, and probably cannot be.  It depends a good deal upon the facts in each case, especially upon the character of the work that is principally engaged in." *Walling v. Bay State Dredging & Contracting Co.*, 149 F.2d 346, 351 (1st Cir. 1945); *see also*

*Walling v. W.D. Haden Co.*, 153 F.2d 196, 199 (5th Cir. 1946) ("The entire Act is pervaded by the idea that what each employee actually does determines its application to him.").[18]

Despite (or perhaps because of) the murkiness of the boundary separating seamen from nonseamen, it is the employer's burden to prove that its employees fall within the scope of this FLSA exemption. *See Martin*, 955 F.2d at 1035.[19]

> **B.    The 20-Percent Rule Applies.**

Against this backdrop of case law and regulations construing the FLSA's seaman exemption, Alabama Pilot proffers two lines of argument regarding the governing legal standard.

First, Alabama Pilot urges this Court to look to the Jones Act and general maritime law to define the term "seaman" and, in particular, points to authority within that body of jurisprudence that a worker may qualify as a seaman even if he spends just 30% of his time performing maritime duties. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 371, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) (identifying as an appropriate "rule of thumb" that one who spends less than 30% of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act). But appellate courts have cautioned that "decisions interpreting the term 'seaman' in other statutes do not necessarily control its meaning in the FLSA." *Harkins v. Riverboat Services, Inc.*, 385 F.3d 1099, 1102 (7th Cir. 2004). In fact, courts have stressed that the definitions of seaman are not interchangeable between the two regimes. *See Martin*, 955 F.2d at 1035 (contrasting broad definition of seaman under Jones Act with narrow definition under FLSA, and

---

[18]    A recent First Circuit opinion underscores the fact-intensive nature of the analysis. In *McLaughlin v. Boston Harbor Cruise Lines*, 419 F.3d 47 (1st Cir. 2005), the court observed that in applying the "seaman" test under FLSA, the DOL regulations "make distinctions that are factually intricate," and that such intricacies are rendered "especially complicated by the fact that many maritime-industry employees ... perform multiple tasks during the course of the day." *Id.* at 51. Such complications are prevalent in the case at bar.

[19]    As the Eleventh Circuit has pointed out, "[t]he employer carries the burden of proving the exemption, and we narrowly construe the overtime provisions of Section 207 against the employer." *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir. 2004); *see also Avery v. City of Talladega, Ala.*, 24 F.3d 1337, 1340 (11th Cir. 1994) ("We construe overtime exemptions narrowly, against the employer."); *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 805 (11th Cir. 1992) ("The Act should be interpreted liberally in the employee's favor," and employer "must prove applicability of an exemption by 'clear and affirmative evidence'") (citation omitted).

explaining that Jones Act construction "is limited to that Act and its remedial goals").[20]  Indeed, in a 1989 opinion, the Fifth Circuit found that the district court had committed reversible error in using the Jones Act definition to determine whether the workers at issue were exempt as seamen under the FLSA, inasmuch as "[i]t is well established that the term under the two acts has different, independent meanings."  *Petroleum Treaters*, 876 F.2d at 524.

The remedial purposes of the Jones Act and the FLSA are vastly different.  The former is designed to cast the seaman net broadly to maximize the scope of coverage for injured employees, while the latter is intended to circumscribe the seaman exemption narrowly to minimize the number of employees who lose the benefit of statutory overtime protections.  *See Petroleum Treaters*, 876 F.2d at 522-23.  Under the circumstances, "to expand the definition [of 'seaman'] under the authority of a separate act clearly would frustrate congressional intent, especially where the other act has a different purpose."  *Id.*  The Court agrees, and finds that the interpretive case law defining "seaman" for purposes of the Jones Act and general maritime law is unilluminating, unhelpful, and potentially detrimental to determining the scope of the FLSA's seaman exemption.  For that reason, the Court declines Alabama Pilot's invitation to import Jones Act authorities to supplant the regulations and caselaw arising under the FLSA with regard to the breadth of the seaman exemption.[21]

---

[20]     *See also Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1412 (9th Cir. 1990) (opining that the term "seaman" is used in a much narrower sense in FLSA than it is under general maritime law); *Owens v. SeaRiver Maritime, Inc.*, 272 F.3d 698, 704 & n.7 (5th Cir. 2001) (determining, as a matter of law, that plaintiff was not a seaman for FLSA purposes, but disavowing any suggestion that plaintiff was not a seaman for Jones Act purposes); *Bay State*, 149 F.2d at 349 (explaining that in context of FLSA seaman exemption, court is not concerned with "the scope of the class of seamen at other times and in other contexts," but is instead focused on defining the term for this particular statute) (citation omitted); *Sternberg Dredging Co. v. Walling*, 158 F.2d 678, 680 (8th Cir. 1947) (rejecting argument that the broad inclusive meaning of the word "seamen" in other statutes passed for seamen's benefit must also be credited in FLSA exemption clause).

[21]     In so concluding, the undersigned recognizes the existence of an outlier case that ascribes far greater importance to maritime law in interpreting the FLSA exemption.  In *Harkins v. Riverboat Services, Inc.*, 385 F.3d 1099 (7th Cir. 2004), the Seventh Circuit found that once plaintiffs have been deemed seamen for Jones Act purposes, "a presumption arises that they are seamen under the FLSA as well."  *Id.* at 1103; *see also Tate v. Showboat Marina Casino*

Second, Alabama Pilot takes the position that the DOL's 20% rule for determining whether an employee performs a substantial amount of nonseaman work, set forth at 29 C.F.R. § 783.37, should be disregarded because it conflicts with Congress's intent in crafting the FLSA.[22] This contention is unpersuasive on several levels.  It ignores binding precedent obliging this Court to give deference to DOL regulations interpreting the FLSA.  *See, e.g., Falken v. Glynn County, Georgia*, 197 F.3d 1341, 1346 (11th Cir. 1999) (declaring that DOL regulations implementing FLSA receive *Chevron* deference, under which courts must defer so long as the regulation is based on a permissible construction of the statute); *Patel v. Quality Inn South*, 846 F.2d 700, 703 (11th Cir. 1988) (observing that while courts are not bound by DOL's interpretation of FLSA, "the Department's interpretation is entitled to considerable deference").  It would have the Court unilaterally jettison a reasonable, helpful agency interpretation that is predicated on a sound construction of a decidedly murky statute.  It completely fails to take into account the fact that courts faced with the difficult task of applying the FLSA's seaman exemption routinely rely on the DOL's 20% rule.  *See, e.g., Martin*, 955 F.2d at 1036

---

*Partnership*, 357 F. Supp.2d 1075, 1080-81 (N.D. Ill. 2005) (applying *Harkins* presumption).  The *Harkins* opinion fails to enunciate any legal basis for such a counterintuitive conclusion, and justifies this novel rule with an offhand reference to "making law a little simpler."  *Harkins*, 385 F.3d at 1103.  The *Harkins* approach stands diametrically opposite that of the Fifth Circuit in *Petroleum Treaters*, conflicts with the recognition by other appellate courts that the term "seamen" has different meanings in the two statutes, makes no allowance for the drastically different remedial purposes of the FLSA and the Jones Act, and fails to square the existence of such a presumption with congressional intent.  Therefore, this Court will not embrace the *Harkins* presumption of seaman status, a minority approach that appears never to have been embraced outside the Seventh Circuit, but will instead apply the Fifth Circuit approach, which in this Court's view much more accurately effectuates Congress's intent and accounts for the vast material divergence in the remedial purposes of the two statutes.

[22]    Alabama Pilot relies on the circular reasoning that the regulations violate the intent of Congress, as construed by those very regulations.  Indeed, defendant argues, "And how do we know the intent of Congress when it comes to seaman?  Because the Wage & Hour Division has told us in its regulations."  (Opposition Brief (doc. 67), at 4.)  Thus, Alabama Pilot would have this Court condemn one section of the regulations by reference to an interpretation of congressional intent found in another section of those same regulations.  But if the same set of regulations embodies two different interpretations of legislative intent, then how would this Court then decide which of the two sections actually reflects the intent of Congress?  Alabama Pilot does not address that question.

(remanding for district court to make limited fact findings as necessary for application of 20% rule); *Worthington v. Icicle Seafoods, Inc.*, 796 F.2d 337, 338 (9th Cir. 1986) ("If the district court finds that more than 20 percent of the plaintiffs' work was not rendered to aid the operation of the vessel as a means of transportation, then plaintiffs were not 'seamen' and are entitled to overtime compensation under the FLSA."). And, perhaps most importantly, Alabama Pilot's argument glosses over the fact that the DOL announced its 20% rule in the context of the seaman exemption back in 1948. Congress has had 59 years to correct any misreading of its intent by the DOL's implementing regulations. As defendant itself recognizes, Congress has taken full advantage of that opportunity to revise the FLSA in other respects, but has left this aspect of the seaman exemption untouched and undespoiled. *See Petroleum Treaters*, 876 F.2d at 522 (recognizing that in 1961 Congress revised the seaman exemption in certain respects, but did not change DOL's interpretive definition as to who qualifies as seamen). This omission is presumed to be the product of an intentional choice by Congress. *See Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").[23]

In sum, the Court finds that the general maritime definition of "seaman" does not delineate the scope of the FLSA seaman exemption. The Court further finds, based on the extant

---

[23]    In an attempt to bolster its argument, Alabama Pilot points out that in August 2004 the DOL revised the interpretive regulations for the so-called "white collar" exemptions to replace the 20% rule with a "primary duty" test. *See* 29 C.F.R. § 541.700; 69 Fed. Reg. 22127-28 (April 23, 2004). (Contrary to plaintiffs' counterargument, this revision was undertaken by the DOL, and not by Congress itself.) But the DOL has left the 20% rule in place with respect to the seaman exemption. That the DOL has recently retreated from the 20% rule in other contexts in no way undermines the 20% rule in the seaman exemption, to which the DOL has held fast for more than half a century. Nothing in the 2004 amendments to the white-collar exemption regulations suggests that Congress did not intend for a 20% limitation to apply for purposes of the seaman exemption. By leaving the rule intact even as it amended so many others, the DOL's position is clearly that such a 20% limitation does apply to the seaman exemption. The Court therefore cannot endorse Alabama Pilot's attempts to substitute the 20% rule with a "primary duty" test in the context of the positions at issue here. The DOL has never applied a "primary duty" rule to the seaman exemption, and its interpretation of that statutory exemption is both reasonable and entitled to deference.

caselaw and the DOL's reasonable construction of the FLSA, which construction is entitled to great deference, that the definition of "seaman" set forth in the interpretive regulations at 29 C.F.R. §§ 783.31 - .37 is applicable here. Thus, an employee who spends more than 20% of his time during the workweek performing service not rendered primarily as an aid in the operation of a vessel as a means of transportation is not exempt from the FLSA's overtime requirements pursuant to the seaman exemption. 29 C.F.R. §§ 783.31, 783.37.

Nonetheless, the 20% rule must not be applied in a strict, mechanical fashion, because the amount of nonseaman's work an employee performs can vary from week to week. In particular, in a given week a "crew member may, *without* any change in basic assignment or position, spend more than 20 percent of his time performing nonseaman's work. This should not mean that the crew member loses his seaman status for that week, and in such a case the crew member should remain a seaman unless, as a *general* matter, a substantial portion of his time was taken up by nonseaman's work." *Owens v. SeaRiver Maritime, Inc.*, 272 F.3d 698, 703 n.5 (5th Cir. 2001). The Court agrees with the *Owens* court's more heuristic application of the 20% rule and will therefore not require a week-by-week breakdown of hours spent on particular tasks, under which plaintiffs might sometimes qualify as seaman and other weeks not, all without any modification to their basic assignment or position. Rather, the focus will be on "the general nature of the work the employee most often performs in his particular position." *Id.*[24] Stated differently, if plaintiffs' basic assignment or position generally requires them to spend more than 20% of their time in the workweek performing nonseaman's work, then they are not eligible for the seaman exemption even if there are certain weeks in which the time they spend on nonseaman's work dips below the 20% threshold.

---

[24] On this point, the Court rejects Alabama Pilot's attempt to force this case into a posture in which plaintiffs' exemption status may change from week to week depending on the particular assignments and ratios of seaman and nonseaman work performed in a given workweek. *See* Defendant's Brief (doc. 46), at 5-6 ("So even if a launch operator exceeds the 20% limitation in a particular work week, he looses [*sic*] the seaman exemption only for that week."). It would defy orderly administration of the FLSA for plaintiffs' exempt status to vacillate from one week to the next based on the idiosyncrasies of their particular assignments for a given week, even as their basic assignment and position remain unchanged.

**C.    *The Record Does Not Definitively Show whether Plaintiffs Qualify as Seamen.***

The summary judgment record reflects that, as a general rule, launch operators' duties are divided among three categories: operating the pilot boat, maintaining radio watch in the radio room, and performing "odd jobs" such as moving cars, watering the grass, cleaning the pilot station, and the like.  To assess whether the 20% limitation on nonseaman work is satisfied, the Court must classify each of these categories of duties as seaman work or nonseaman work.

        1.    *Operating the Launch.*

The parties are in agreement that the launch operators spend, on average, approximately 29% of their working hours operating the pilot boats while transporting bar pilots to and from vessels entering and leaving the Mobile ship channel.  There can be no reasonable debate that such duties constitute performing, as master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel a means of transportation.  This aspect of plaintiffs' duties is seaman work.

Operating the pilot boats may be the launch operators' most important job duty; indeed, multiple plaintiffs acknowledged during their depositions that this responsibility was their primary function.  But the applicable test for the seaman exemption is not whether plaintiffs' primary duty is seaman work.  To say that captaining the launch vessels is plaintiffs' principal job duty is not necessarily to conclude that they are seamen under the FLSA; rather, we must investigate further to ascertain whether, notwithstanding these obviously seaman duties, plaintiffs also perform a "substantial amount of work of a different character."  29 C.F.R. § 783.31.  If this question is answered affirmatively, then plaintiffs are not classified as seamen within the narrow meaning ascribed to the term under the FLSA, and are not exempt from that statute's overtime provisions.  For that reason, we now examine plaintiffs' activities during the 70+ percent of their working hours that they do not spend actively captaining the pilot boats on the water.

        2.    *Maintaining Radio Watch.*

The record is clear that plaintiffs spend a substantial percentage of their working hours on dry land in the radio room of the pilot station monitoring radios and telephones.  The nature of the bar pilot business is such that bar pilots may be needed by an inbound or outbound vessel on short notice.  A schedule is disseminated in advance, but last-minute changes are not infrequent,

and it is necessary for the launch operators to be ready to transport the bar pilots by launch at all times.  Moreover, the launch operators generally do not know exactly when pilot boat services will be needed until they are notified by the pilot, by a vessel or by a dispatcher.  (McClure Dep., at 35.)  Accordingly, plaintiffs spend a considerable portion of their working hours on standby, waiting for the telephone or radio call that will immediately press them into service captaining the pilot boats.[25]  It is therefore of no small import to assess whether this substantial job function of the launch operators is properly classified as seaman work.

        As the DOL interpretive regulations make clear, a worker does not have to be actively navigating the vessel for his work to qualify as seaman work; to the contrary, a variety of ancillary, support functions (*e.g.*, engineers, radio operators, cooks, stewards) qualify as seaman work, provided that the work is (a) performed "as master or subject to the authority, direction, and control of the master aboard the vessel," and (b) "rendered primarily as an aid in the operation of such vessel as a means of transportation."  29 C.F.R. §§ 783.31-.32.  To clarify the point, the regulations helpfully offer the example of a crew member serving as a watchman aboard a vessel during a temporary stay in port or during a brief lay-up for minor repairs.  29 C.F.R. § 783.35.  According to the regulations, that watchman function is a seaman duty, as is the function of having licensed relief engineers maintain the ship in safe and operational condition and exercise the authority of the master in his absence.  *Id.*[26]

---

[25]        The significance of this function is underscored by the following deposition exchange:

> "Q:     For instance, what do the launch operators do?  What are they supposed to
>           be doing when they are not operating a pilot boat?
> "A:     The biggest job is to maintain our radio watch.
> "Q:     And that's pretty much ongoing throughout the whole shift?
> "A:     Any time they are not in the pilot boat, we have a man standing by on the
>           radio."

(Barrett Dep., at 40.)

[26]        That said, the regulation narrowly cabins that fact pattern by indicating that watchman services would not be deemed a seaman function if the vessel were laid up for a considerable period, or if the watchman were furnished by an independent contractor, or if the vessel were watched by a temporary crew hired merely to maintain the vessel while in port.  29

Based on the undisputed evidence in the record, it is the opinion of this Court that the launch operators' radio watch duties satisfy both criteria of the definition for seaman's work under the FLSA.  In performing radio watch, the launch operators are acting in their capacity as masters and sole crew members of the pilot boats.  The pilot boats undertake multiple voyages a day, but they may leave at any time of day or night, often on short notice and always being captained by the launch operators.  In awaiting instructions to launch their vessels, plaintiffs are acting as master of their pilot boats.  Likewise, these radio watch functions are plainly rendered primarily as an aid in the operation of the pilot boats as a means of transportation.  If no launch operator were standing by and waiting to be pressed into service upon notification from a bar pilot, incoming vessel, or dispatcher that pilot boat services were needed, then the pilot boats would be utterly useless as a means of transportation.  Stated differently, a pilot boat cannot operate as a means of transportation without a crew and captain.  The launch operators serve as both crew and captain.  The nature of the bar pilot business is that the launches must be prepared to sail immediately to deliver bar pilots to inbound vessels or to pick bar pilots up from outbound vessels.  Unless that crew/captain is monitoring radio traffic at all times, standing by and awaiting instructions to set sail from the Dauphin Island dock, as it does multiple times each day, the pilot boat cannot serve as a means of transportation at all.  In that respect, the Court finds that plaintiffs' radio watch duties are analogous to those of a crew member serving as a watchman during a vessel's temporary stay in port, which the regulations expressly deem to be exempt seaman's duties.

In reaching this conclusion, the undersigned considers and deems unpersuasive several counterarguments by plaintiffs.  As an initial matter, plaintiffs contend that a duty cannot qualify as seaman work unless it is actually performed aboard a vessel, and that no tasks on land can ever constitute seaman work.  (Plaintiffs' Brief (doc. 55), at 11-14.)  But the regulations specify that one's eligibility for the seaman exemption "depends upon the character of the work he actually performs and ***not on ... the place where it is performed***."  29 C.F.R. § 783.33 (emphasis added); *see also W.D. Haden*, 153 F.2d at 199 (words of FLSA seaman exemption "warn us to look to what the employees do, and not to rest on a mere matter of a name, or the place of their

---

C.F.R. § 783.35.

work").[27]  Moreover, while case authority is limited on this point, extant authorities reflect that even when a vessel is temporarily in drydock and its crew members are living ashore, those crew members performing maintenance and repairs on the vessels are continuing primarily to perform seaman's work.  *Walling v. Keansburg Steamboat Co.*, 162 F.2d 405, 406-07 (3rd Cir. 1947); *see generally Harkins*, 385 F.3d at 1104 (ship crew members who are scraping barnacles off docked ship's hull are engaged in maritime work); *Tate v. Showboat Marina Casino Partnership*, 357 F. Supp.2d 1075, 1082-83 (N.D. Ill. 2005) (ship employees who acted as security guards on the dock, or who stood onshore to monitor passengers' safety as passengers boarded vessel, performed functions directly related to a seaman's primary maritime function, and were therefore seaman's duties).  The Court therefore concludes that the launch operators' radio watch duties are not stripped of their seaman character because plaintiffs perform them in a building 30 feet away from the dock, rather than aboard a vessel.[28]

Next, plaintiffs maintain that radio watch cannot be a seaman's duty unless such services are rendered primarily as an aid to navigation.  (Plaintiffs' Brief, at 14-15.)  Plaintiffs read the applicable regulations too narrowly.  There is no requirement that services be rendered primarily

---

[27]        Of course, that principle is limited by the DOL's recognition that the overtime exemption is "not intended to apply to any employee who is not employed on a vessel."  29 C.F.R. § 783.31.  Once that threshold requirement of employment on a vessel is satisfied, however, § 783.33 stands for the proposition that whether particular duties in furtherance of that employment on a vessel are performed on a boat or on dry land is of no consequence.

[28]        Conceptually, the most serious defect with plaintiffs' "aboard the vessel" argument is that it ignores the symbiotic relationship between launch operators' primary duty of operating the pilot boats (which unquestionably occurred aboard a vessel) and their ancillary responsibility of performing radio watch.  The two functions are closely intertwined, and the sole reason why Alabama Pilot engages plaintiffs to perform radio watch is to enable them to know the exact moment when it is necessary to set sail in the pilot boat.  The point is this: Plaintiffs could not perform their crew duties "aboard a vessel" unless they also engaged in radio watch.  The radio watch thus facilitates and enables plaintiffs to perform seaman duties aboard a vessel, such that the function is seaman in character, irrespective of the specific physical location at which the launch operators monitor radios.  To hold otherwise would be to engage in a highly arbitrary distinction, under which the radio-monitoring duty is exempt seaman's work if performed on a pilot boat moored at the dock, but is nonexempt nonseaman's work if performed in a building 30 feet away.  Such a distinction would be both arbitrary and irrational, and finds no direct support in the regulations or caselaw.

-20-

as an aid to navigation of a vessel to constitute seaman work; rather, the "aid to navigation" element is a subset of the types of functions that may qualify as seaman's work.  In particular, "one is not employed as a seaman within the meaning of the Act unless one's services are rendered primarily as an aid in the operation of the vessel as a means of transportation, ***as for example services performed substantially as an aid to the vessel in navigation***."  29 C.F.R. § 783.33 (emphasis added).  Thus, the applicable test is not whether radio watch substantially aids a vessel in navigation, as plaintiffs argue, but is instead whether such services are rendered primarily as an aid in the operation of the vessel as a means of transportation.  The Court answers that question affirmatively, for the reasons stated above.

Finally, plaintiffs characterize their radio watch duties as mere dispatching, secretarial or clerical functions because plaintiffs may field calls other than those advising them that a pilot boat voyage is necessary at a particular time.  The record is clear, however, that handling these calls is simply incidental to the radio watch function.  Alabama Pilot's launch operators do not man the phones for the purpose of providing hospitality and greetings to the general public, taking down or conveying messages, or directing traffic; rather, they are sitting by the phone/ radio at the ready because they are waiting for calls instructing them to set sail in the pilot boats immediately.

For all of these reasons, the Court finds that Alabama Pilot's launch operators are performing seaman work when they are engaged in radio watch, standing by to operate the vessels aboard which they serve as both captain and crew.

> ### 3.    *Performing Odd Jobs.*

The third and final category of work consists of what various plaintiffs aptly describe as "odd jobs" or "general handyman stuff," and is fairly summarized by plaintiffs' counsel as involving the tasks of "handymen, painters, gardeners, mechanics, chauffeurs, and all around general laborers."  (Plaintiffs' Brief, at 25.)

Alabama Pilot concedes that plaintiffs do perform these duties from time to time, and further concedes that most of these tasks are not seaman work.  The Court agrees.  Launch operators are clearly not rendering service primarily as an aid in the operation of their vessel as a means of transportation when they are taxiing bar pilots around coastal Alabama by car, painting a house, performing landscaping services, or engaged in similar tasks at the building and grounds

adjacent to the dock.

Nonetheless, defendant asserts that a few of these types of tasks do qualify as seaman's work, such as assisting with the general maintenance of the boats and painting and cleaning the pilot station.  As to the former, the types of low-grade vessel maintenance services at issue here (*e.g.*, checking the fluids on each shift, visually inspecting the vessel for damage, painting and cleaning the vessel, keeping the logbooks, and assisting the port engineer with maintenance tasks on the vessels from time to time) are, in this context, clearly services rendered primarily as an aid in the operation of the vessel as a means of transportation.  *See* 29 C.F.R. § 783.35 (relief officers who, during short stays in port, maintain the ship in safe and operational condition and exercise the authority of the master over the vessel, are employed as seamen); *Harkins*, 385 F.3d at 1104 (interpreting § 783.31 to provide that a marine crew's actions in ensuring the vessel's safe and efficient operation and maintenance while it is docked are maritime functions, such that vessel's crew are acting as seamen in performing such duties).  Plaintiffs do not contend that such responsibilities fall outside the realm of seaman's work.

As to the latter, by contrast, the janitorial, painting, and cleaning functions that plaintiffs perform around the pilot station cannot reasonably be viewed as having any reasonable connection to seamen's work.  Defendant's suggestion that such duties should be viewed as seaman's work because the launch operators would have to perform such duties if they were stationed on the boat misstates the relevant inquiry.  As stated repeatedly herein, the test is whether these services are rendered primarily as an aid in the operation of the vessel as a means of transportation.  Whether launch operators scrub the toilets, clean the windows, and polish the stovetop in their crew quarters on land does not in any way benefit or impact the operation of the pilot boats as a means of transportation.  (The same may not be true if they were performing such functions aboard a vessel at sea.)  As such, these types of duties are simply too attenuated from the operation of the pilot boats to qualify as seaman's work under the FLSA test.[29]

―――――――――――――――――

[29]      Despite contending otherwise in its initial brief, defendant concedes, solely for summary judgment purposes, that plaintiffs' function of "moving cars" (that is, driving bar pilots by car to various docks or dropping off cars for them at various docks) is not seaman's work.  This concession was prudent.  Such taxi or chauffeuring services may be of substantial convenience to the launch operators' employers (the bar pilots), but they in no way can be

Thus, the summary judgment record reflects that the plaintiff launch operators do perform certain nonseaman duties on an ongoing basis.  The question for FLSA purposes is whether those nonseaman duties, viewed in the aggregate, constitute a substantial amount of work.  More precisely, under the DOL regulations, the critical inquiry is whether launch operators spend more than 20% of their working time engaged in nonseaman endeavors. Unfortunately, the record is inconclusive on this point.  Defendant shows that plaintiffs spend only approximately 5% of their work hours engaged in driving cars, and characterize the evidence as being that their time spent on other nonseaman tasks was "minimal."  (Defendant's Reply Brief (doc. 66, at 3.)  There is some evidence to support that position, as for example Kirk Barrett's testimony that launch operators spend most of their time watching television because there is little work to do around the pilot station.  But there is also evidence to the contrary. Plaintiff McClure testified that the launch operators "spend more time doing other stuff" akin to general handyman work than they do acting as seamen.  (McClure Dep., at 30.)  Plaintiff Godard testified that plaintiffs routinely engaged in "general labor and whatever had to be done" because "[t]here was always something to do around there" when the pilot boats were not in use. (Godard Dep., at 76.)  In an average week, how much time do plaintiffs spend performing nonseaman's work?  The evidence is conflicting on this crucial factual point, which the Court cannot resolve at this juncture without making credibility determinations and engaging in inferences beyond those permissible on summary judgment.  *See generally Harkins*, 385 F.3d at 1104 (concluding that a jury question was presented as to whether plaintiffs were performing sufficient maritime work to qualify as seamen under FLSA).

## IV.   Conclusion.

The key legal question posed by the parties' cross-motions for summary judgment is whether the plaintiff launch operators are subject to the seaman exemption to the overtime provisions of the Fair Labor Standards Act.  That determination hinges on whether plaintiffs

---

construed as being rendered primarily as an aid in the operation of the pilot boats as a means of transportation.  The bar pilots are mere passengers on the pilot boats, not crew members. Arrangements that plaintiffs may make to facilitate their passengers' ground transportation before or after their pilot boat voyages cannot reasonably be viewed as primarily aiding the operation of the pilot boats as a means of transportation.

spend more than 20% of their working time engaged in nonseaman duties.  The record reveals a genuine issue of material fact on that question; therefore, both defendant's Motion for Summary Judgment (doc. 45) and plaintiffs' Motion for Summary Judgment (doc. 54) are **denied**.[30]

As stated *supra*, the triable issue presented is whether plaintiffs' basic assignment or position generally requires them to spend more than 20% of their time in a workweek performing nonseaman's work.  In making final preparations for trial on that issue, the parties should not rely on outlier data or unusual, short-term circumstances in which plaintiffs' duties may have temporarily been modified.  We are not interested in what duties the launch operators may have been assigned for a week after the storm of the century, or on an isolated extraordinary occasion.  As this Court and others apply the 20% rule, such temporary, short-term fluctuations are of no consequence; rather, the relevant issue is whether, on average, plaintiffs' general, week-to-week assignments and job duties for Alabama Pilot required them to spend more than 20% of their time performing nonseaman tasks during the period of concern.  If defendants (who bear the burden of proving that the exemption applies) are able to prove at trial by a preponderance of the evidence that the answer to this question is no, then the FLSA seaman exemption will apply and

---

[30]     Because it is not possible to determine at the Rule 56 stage whether Alabama Pilot is or is not in violation of its legal duties under the FLSA, it would be premature to pass judgment on whether any such violation is willful or whether plaintiffs would be entitled to liquidated damages if they prevail.  Those issues are therefore reserved for trial.  That said, the Court is not at all convinced that there are fact questions on that issue, given the unequivocal testimony of defendant's representative, David Wittendorfer, that prior to this lawsuit, Alabama Pilot never conducted any investigation or study as to whether its compensation practices for launch operators comported with the FLSA; instead, the company went no further than to comply with the terms of the collective bargaining agreement in place between Alabama Pilot and the launch operators' union.  (Wittendorfer Dep., at 62.)  Based on this admission that Alabama Pilot made no inquiries and conducted no analysis of the FLSA status of employees whom they assigned to work as many as 84 hours per week as "general handymen," among other things, defendant may be hard-pressed to avoid a finding of a willful violation and liquidated damages if in fact plaintiffs are not deemed eligible for the seaman exemption.  *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-35, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) (FLSA violation is willful if employer either knew or showed reckless disregard for whether its conduct was violative of the FLSA); *Spires v. Ben Hill County*, 980 F.2d 683, 689 (11th Cir. 1993) (employer who seeks to avoid FLSA liquidated damages bears burden of proving that violation was both in good faith and predicated on such reasonable grounds that it would be unfair to impose more than a compensatory verdict).

judgment will be entered against plaintiffs.  Otherwise, plaintiffs will prevail and the court will enter judgment in their favor on the overtime claims, taking up the willfulness and liquidated damages issues at that time.[31]

DONE and ORDERED this 10th day of April, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

_____

[31]    As one final housekeeping matter, plaintiffs have filed a Motion to Strike Expert Report and Testimony of Daniel F. MacKinnon (doc. 53).  Given the very limited purposes served by MacKinnon's report (which is attached as Exhibit 19 to defendant's evidentiary submission (doc. 47)), the Court finds that plaintiffs' objections are without merit.  Contrary to plaintiffs' contention, defendant does not hold MacKinnon out as an expert on the FLSA; rather, MacKinnon's report merely states, based on his experience in the maritime industry, that the industry would generally consider individuals performing launch operator duties to be seamen.  Such testimony is not improper under Rule 702, Fed.R.Evid.; therefore, the Motion to Strike is **denied**.  That said, because "seaman" is a term of art for FLSA purposes, MacKinnon's opinions as to how those in the maritime industry might generally apply the term are largely unhelpful to the issues on summary judgment.